# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 11, 2013        Decided July 18, 2014

No. 12-5234

UNITED STATES OF AMERICA,
APPELLEE

v.

VOLVO POWERTRAIN CORPORATION,
APPELLANT

CALIFORNIA AIR RESOURCES BOARD,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:98-cv-02547)

———

*Aaron M. Streett* argued the cause for appellant. With him on the briefs were *Lauren Tanner*, *William H. Jeffress, Jr.*, and *William M. Bumpers*.

*Russell S. Frye* was on the brief for *amici curiae* the National Association of Manufacturers, et al. in support of appellant.

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for appellee the United States. With him on the brief was *Lori Jonas*, Attorney.

*Kamala D. Harris*, Attorney General, Office of the Attorney General for the State of California, *Robert W. Byrne*, Senior Assistant Attorney General, and *Nicholas Stern*, Deputy Attorney General, were on the brief for appellee California Air Resources Board.

Before: GRIFFITH and SRINIVASAN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: Under the Clean Air Act, manufacturers of new motor vehicle engines need to obtain certificates of conformity from the Environmental Protection Agency before selling their engines in the United States. To obtain the certificates, manufacturers must verify that their engines comply with EPA emissions standards. In 1998, EPA alleged that several major engine manufacturers had violated federal law by equipping certain engines with "defeat devices" designed to suppress emissions during EPA tests even though emissions exceeded the legal limit in normal operating conditions. The manufacturers settled the allegations, and each entered into similarly worded consent decrees with the federal government.

The consent decrees required the manufacturers to satisfy future EPA emissions standards ahead of schedule. In particular, the decrees provided that certain model year 2005 engines for which the manufacturers sought certificates of conformity would meet model year 2006 limits on emissions of oxides of nitrogen ($NO_x$). The decrees' requirements apply to engines "manufactured at any facility owned or operated by" the settling companies.

Volvo Powertrain Corporation, a wholly owned subsidiary of the Swedish conglomerate AB Volvo, is one of the companies subject to such a decree. Volvo Powertrain owns and operates a facility in Skövde, Sweden, where it and other Volvo subsidiaries manufacture engines. Another wholly owned Volvo subsidiary, AB Volvo Penta, sought certificates of conformity from EPA for 8,354 model year 2005 engines manufactured at the Skövde facility. Those engines did not comply with EPA's model year 2006 $NO_x$ emissions standard.

Volvo Powertrain now argues that the consent decree has no application to the Volvo Penta engines even though, under the language of the decree, the engines were manufactured at a "facility owned or operated by" a settling company. The district court disagreed, and it held Volvo Powertrain liable for the failure of the 2005 engines to satisfy the 2006 emissions standard. As a remedy, the court ordered Volvo Powertrain to pay approximately $72 million, an amount calculated in accordance with the consent decree's schedule of stipulated penalties for violations of the decree's requirements.

We agree with the district court that the consent decree applies to the 8,354 Volvo Penta engines manufactured at the Volvo Powertrain plant. Although Volvo Penta, not Volvo Powertrain, sought the certificates of conformity in question, we read the terms of the consent decree to impose liability on Volvo Powertrain for its affiliate's engines manufactured at its facility. We also conclude that the district court committed no abuse of discretion when it ordered Volvo Powertrain to pay approximately $72 million as a remedy for the violations of the decree. We therefore affirm the judgment of the district court.

4

I.

A.

The Clean Air Act requires the EPA Administrator to prescribe standards for emissions of air pollutants from new motor vehicles and motor vehicle engines if the emissions "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." Clean Air Act § 202(a)(1), 42 U.S.C. § 7521(a)(1). A manufacturer who desires to sell new motor vehicle engines in the United States must conduct tests to show that the engines meet emissions standards prescribed under section 202. *See id.* § 206(a)(1), 42 U.S.C. § 7525(a)(1); *see also* 40 C.F.R. § 89.119(a)-(b). If the engine meets EPA standards, the agency issues a "certificate of conformity" allowing the manufacturer to sell the engines in the United States for up to one year. *See* Clean Air Act § 206(a)(1), 42 U.S.C. § 7525(a)(1). It is unlawful to sell new motor vehicle engines in the United States or to import new engines into the country without a certificate of conformity. *See id.* § 203(a)(1), 42 U.S.C. § 7522(a)(1).

The Clean Air Act also allows the State of California to adopt and enforce emissions standards for new motor vehicles and motor vehicle engines if California determines that its standards "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id.* § 209(b)(1), 42 U.S.C. § 7543(b)(1); *see also Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 196 (D.C. Cir. 2011). A vehicle or engine generally cannot be sold in California or imported into the state until the California Air Resources Board certifies compliance with state emissions standards. *See* Cal. Health & Safety Code §§ 43151-43153 (Deering 2014). Certificates issued by the California Air Resources Board are called "executive orders."

The pollutants subject to emissions limits under the Clean Air Act and California law include oxides of nitrogen, or $NO_x$. *See* Clean Air Act § 202(a)(3)(A)(i), 42 U.S.C. § 7521(a)(3)(A)(i); 40 C.F.R. § 89.112; Cal. Code Regs. tit. 13, § 2423. $NO_x$ emissions contribute to the formation of fine particulate matter, also known as $PM_{2.5}$, as well as ground-level ozone, a primary component of smog. *See North Carolina v. EPA*, 531 F.3d 896, 903 (D.C. Cir. 2008). Elevated levels of fine particulate matter have been linked to "adverse human health consequences such as premature death, lung and cardiovascular disease, and asthma." *Catawba Cnty. v. EPA*, 571 F.3d 20, 26 (D.C. Cir. 2009). And "even at very low levels," inhalation of ozone "can cause serious health problems by damaging lung tissue and sensitizing lungs to other irritants." *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 671 n.1 (9th Cir. 2012).

In 1998, the United States brought enforcement actions in federal district court against seven major engine manufacturers, alleging that they had been using "defeat devices" to meet EPA standards for $NO_x$ emissions. The devices enabled the engines to meet EPA emissions standards in laboratory testing even though the engines produced $NO_x$ emissions far above the applicable limit in ordinary use. *See Crete Carrier Corp. v. EPA*, 363 F.3d 490, 491 (D.C. Cir. 2004). The manufacturers collectively negotiated settlement terms with the federal government. Most of the manufacturers agreed to be bound by similarly worded consent decrees so that none would gain a competitive advantage by negotiating a better deal. The manufacturers did not admit to using defeat devices, but they agreed to pay civil penalties exceeding $80 million collectively.

To offset excess $NO_x$ emissions caused by the alleged violations, the manufacturers also agreed to comply with certain

EPA emissions standards earlier than EPA regulations otherwise required. Most significantly for purposes of this case, the manufacturers agreed that their nonroad compression-ignition (or diesel) engines with 300 to 750 horsepower would comply with EPA's model year 2006 emissions standards one year ahead of schedule, starting with model year 2005. The parties refer to that provision of the consent decree as the "nonroad pull-ahead" requirement. The manufacturers agreed to pay stipulated penalties to the United States under an established formula if they certified nonroad compression-ignition engines for model year 2005 that failed to comply with the nonroad pull-ahead requirement.

Volvo Truck Corporation (Volvo Truck, or VTC), a wholly owned subsidiary of AB Volvo, was one of the manufacturers covered by the standard form consent decree. Its decree states that all heavy-duty diesel and nonroad compression-ignition engines "manufactured at any facility owned or operated by VTC on or after January 1, 1998, for which a Certificate of Conformity is sought, must meet all applicable requirements of this Decree, regardless of whether VTC still owned, owns, operated, or operates that facility at the time the engine is manufactured." Consent Decree ¶ 110. Another wholly owned subsidiary of AB Volvo, Volvo Construction Equipment Components AB, filed a motion to intervene in the case. Volvo Construction stated that it "is the Volvo Group company that sells [nonroad] engines in the United States" and that it sought to intervene "[t]o ensure that the proper Volvo Group company is subject to the jurisdiction of the Court for purposes of the Consent Decree requirements applicable to Nonroad CI Engines." Mot. to Intervene at 2 (June 11, 1999). The district court granted Volvo Construction's motion to intervene, and, on July 1, 1999, approved the consent decree.

Volvo Truck and Volvo Construction entered into a similarly worded settlement agreement with the California Air Resources Board. Like the consent decree with EPA, the settlement agreement with the California Air Resources Board includes a nonroad pull-ahead requirement, a schedule for stipulated penalties, and a provision confirming that the agreement applies to all heavy-duty diesel and nonroad compression-ignition engines "manufactured at any facility owned or operated by" Volvo Truck. The settlement agreement with the California Air Resources Board was not incorporated into a consent decree. *See Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 280-81 (4th Cir. 2002) (consent decree is enforceable as order of the court, whereas settlement agreement generally is not).

B.

At the time of the consent decree, Volvo Powertrain Corporation, a subsidiary of Volvo Truck, owned a facility in Skövde, Sweden. Volvo Truck produced engines at the site. In 2001, as part of a corporate reorganization, Volvo Powertrain ceased to be a subsidiary of Volvo Truck and became a direct subsidiary of AB Volvo. In 2002, Volvo Powertrain informed the district court and the California Air Resources Board that it would assume Volvo Truck's responsibilities under the consent decree and settlement agreement.

Although Volvo Powertrain owns the Skövde facility, another wholly owned subsidiary of AB Volvo, AB Volvo Penta, also manufactures engines there. Volvo Penta has produced nonroad engines at Skövde since before 1995 and has obtained certificates of conformity from EPA (and executive orders from the California Air Resources Board) for those engines every year since 1997. In late 2004, Volvo Penta sought certificates of conformity from EPA and executive orders from

the California Air Resources Board for 8,354 model year 2005 nonroad compression-ignition engines produced at Skövde. Volvo Penta did not certify that those engines comply with the model year 2006 emissions standards, as would be required if the nonroad pull-ahead provision applied to the engines.

In an October 2004 e-mail, a California Air Resources Board official asked a Volvo Penta certification engineer if Volvo Penta is part of Volvo Construction and, "[i]f so," whether Volvo Penta is "aware of the provisions of the consent decree." The certification engineer responded that "Volvo Penta is an independent company and we are not a part of the consent decree." According to a Volvo Penta executive's affidavit, no one on the certification staffs of EPA or the California Air Resources Board advised Volvo Penta that the 8,354 engines were subject to the nonroad pull-ahead requirement. EPA issued certificates of conformity covering the engines, and the California Air Resources Board issued corresponding executive orders.

In September 2005, a tip from Caterpillar Inc., a competing engine manufacturer subject to a similarly worded consent decree, prompted federal officials to seek additional information about Volvo Penta's model year 2005 engines. Volvo Powertrain acknowledged that the model year 2005 Volvo Penta engines failed to comply with the nonroad pull-ahead requirement, but asserted that those engines "are not subject to" the consent decree. Federal officials maintained that the decree by its terms encompassed the Volvo Penta engines because they were "manufactured at [a] facility owned or operated by" Volvo Powertrain. In July 2008, the United States sent a demand letter to Volvo Powertrain seeking $72,006,337 in stipulated penalties and interest. Volvo Powertrain invoked the consent decree's dispute resolution mechanism, which provides for the district court to adjudicate disputes between the parties if informal

negotiations fail. The California Air Resources Board intervened in the action to enforce parallel provisions of the settlement agreement.

In April 2012, the district court concluded that all 8,354 Volvo Penta engines in question are subject to the nonroad pull-ahead requirement in the consent decree and settlement agreement. But the court also concluded that the stipulated penalty provisions in the consent decree and the settlement agreement "do not clearly apply" when Volvo Penta, rather than Volvo Powertrain, certifies the noncompliant engines. *United States v. Volvo Powertrain Corp.*, 854 F. Supp. 2d 60, 65, 75 (D.D.C. 2012). The court explained that, if the consent decree were an "ordinary contract," the court would find the stipulated penalty provision to be ambiguous and "would proceed to examine extrinsic evidence of the parties' intent." *Id.* at 72. But because the agreement between Volvo Truck and EPA had been embodied in a consent decree, the court held that it had discretion to "fashion an equitable remedy for the violation that it has found." *Id.* It then looked for "guidance" to the formula established by the stipulated penalty provision. *Id.* at 73. The court calculated that Volvo Powertrain would owe $65,759,212 in stipulated penalties under that formula, plus $6,247,125 in interest, for a total of $72,006,337. The court ordered Volvo Powertrain to pay that amount to the United States. The court decided to conduct further proceedings to determine Volvo Powertrain's liability to the State of California. *Id.* at 75.

After the district court's decision, the parties jointly stipulated that their intent throughout had been that any award for violations of the consent decree and settlement agreement would be divided such that the United States would receive 80% and the California Air Resources Board would receive 20%. The parties further agreed that the interest award should be revised downward to $5,866,428, bringing the total amount of

the judgment to $71,625,640. In June 2012, the district court entered final judgment against Volvo Powertrain in line with the parties' proposal. Volvo Powertrain appeals.

II.

Because the district court's judgment against Volvo Powertrain was based on violations of the consent decree with the United States, and because the parties stipulated that further proceedings to determine Volvo Powertrain's liability to the California Air Resources Board are "unnecessary," we review the district court's construction of the consent decree but not of the settlement agreement. Our review is de novo. *See Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006).

A.

As an initial matter, Volvo Powertrain contends that the district court should have interpreted and enforced the consent decree according to the standards governing a motion to find a party in contempt for violating a consent decree's provisions. "A party seeking to hold another in contempt faces a heavy burden, needing to show by 'clear and convincing evidence' that the alleged contemnor has violated a 'clear and unambiguous' provision of the consent decree." *United States v. Microsoft Corp.*, 147 F.3d 935, 940 (D.C. Cir. 1998) (quoting *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)). We decline to apply those standards here. As for the "clear and convincing evidence" aspect of that framework, Volvo Powertrain affirmatively waived the argument in the district court and the standard would have no discernible effect on our disposition in any event. As for the requirement to show that the language of the decree is "clear and unambiguous," Volvo Powertrain forfeited the argument by failing to raise it in the district court.

Volvo Powertrain directs us only to two points in the record at which it even remotely referenced contempt principles. First, in its brief to the district court, Volvo Powertrain cited *Stewart v. O'Neill*, 225 F. Supp. 2d 6 (D.D.C. 2002), for the proposition that "a movant seeking enforcement of a court order through civil contempt must prove 'a violation of the Court's Order by clear and convincing evidence.'" Mem. in Supp. of Mot. for Judicial Review 13, ECF No. 40 (alteration omitted) (quoting *Stewart*, 225 F. Supp. 2d at 10). Second, at a motions hearing in the district court in January 2012, counsel for Volvo Powertrain stated:

> [T]here are a couple of principles, Your Honor, on which the parties do agree. One is that in interpreting a consent decree the Court applies ordinary principles of contract interpretation. The second on which we agree is that the government has the burden. You will see mentioned in our brief that we contend that it is clear and convincing evidence that's required. The government says that's not true, it's preponderance. Frankly, when you're not really finding facts, I'm not sure there's much difference, and we're satisfied with the preponderance standard.

Insofar as its district court brief invoked the rule that violations of a consent decree must be proven by "clear and convincing evidence," Volvo Powertrain waived that argument at the January 2012 hearing by embracing a preponderance standard. *See Barone v. Williams*, 199 F.2d 189, 191 (D.C. Cir. 1952). In any event, as Volvo Powertrain's counsel explained, the evidentiary standard makes little difference in this case because there is no dispute that the 8,354 engines certified by Volvo Penta were manufactured at Powertrain's facility in Skövde, Sweden, or that those engines failed to comply with the

nonroad pull-ahead requirement. As for any argument that liability should be limited to violations of "clear and unambiguous" provisions of the consent decree, it is likewise unclear whether that standard would make any difference: we find below that the nonroad pull-ahead requirement unambiguously applies to the Volvo Penta engines at issue. Volvo Powertrain, at any rate, made no mention in the district court of the "clear and unambiguous" standard and gives us no reason to disregard our ordinary practice of refusing to "entertain an argument made for the first time on appeal." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 (D.C. Cir. 2008).

Volvo Powertrain contends that contempt standards should govern regardless of whether it raised the issue in the district court, but the two decisions on which it relies fail to support that proposition. In *Reynolds v. Roberts*, 207 F.3d 1288 (11th Cir. 2000), the district court acted sua sponte in enforcing the consent decree and the appellants had only a limited opportunity to present their objections. *Id.* at 1296-97 & n.13. Volvo Powertrain, by contrast, had a full opportunity in the district court to argue in favor of applying the contempt framework. And in *Reynolds v. McInnes*, 338 F.3d 1201 (11th Cir. 2003), the court reaffirmed the "general principle of appellate review" that "an appellate court will not consider issues not presented to the trial court," *id.* at 1209 (internal quotation marks omitted), and declined to consider whether the district court should have applied contempt principles because the argument "was not raised in the district court," *id.* at 1204. We adhere to the same practice here.

13

B.

Having rejected Volvo Powertrain's argument to apply the contempt framework, we review the district court's interpretation of the decree according to general principles of contract law. *See Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (consent decree is "essentially a contract," and "construction of a consent decree is essentially a matter of contract law") (internal quotation marks omitted). "[U]ltimately the question for the lower court, when it interprets a consent decree incorporating a settlement agreement, is what a reasonable person in the position of the parties would have thought the language meant." *Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997).

Here, the key language appears in paragraph 110 of the consent decree. That paragraph states that "[a]ll" nonroad compression-ignition engines "manufactured at any facility owned or operated by VTC on or after January 1, 1998, for which a Certificate of Conformity is sought, must meet all applicable requirements of this Decree, regardless of whether VTC still owned, owns, operated, or operates that facility at the time the engine is manufactured." One of the "requirements" of "this Decree" is the nonroad pull-ahead. *See* Consent Decree ¶ 60. Volvo Powertrain is the successor to Volvo Truck under the decree, and the 8,354 Volvo Penta engines in question were manufactured at a "facility owned [and] operated by" Volvo Powertrain. Thus, when a "Certificate of Conformity [was] sought" for each of those engines, the engines were required to "meet all applicable requirements of [the] Decree," including the nonroad pull-ahead.

Volvo Powertrain's contentions to the contrary are unavailing. Volvo Powertrain argues that paragraph 110 intends only to ensure that, if a manufacturer were to sell one of its

factories, the acquiring company would inherit the manufacturer's obligations under the consent decree. Under that reading, paragraph 110 would take effect *only* if Volvo Powertrain no longer owns or operates one of its former facilities. But paragraph 110 by its terms applies to all engines manufactured at a Volvo Powertrain facility "*regardless* of whether" Volvo Powertrain still owns or operates the facility. Volvo Powertrain's interpretation ignores the import and plain meaning of the word "regardless." Volvo Powertrain also contends that paragraph 110 mandates only that engines manufactured at its facilities comply with the "applicable requirements" of the consent decree, and the nonroad pull-ahead provision on its face does not apply to engines manufactured by Volvo Penta. *See* Consent Decree ¶ 60 ("Nonroad CI Engines *manufactured by VTC or its affiliate, [Volvo Construction]*, on or after January 1, 2005" are subject to model year 2006 requirements) (emphasis added). That is, Volvo Powertrain reads the phrase "applicable requirements" in paragraph 110 to refer only to any requirements that *already apply* to the engines in question by virtue of another provision of the consent decree, i.e., if paragraph 110 never existed. We reject that reading because it would render the operative terms of paragraph 110 entirely superfluous. *See Rumpke of Ind., Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1243 (7th Cir. 1997) (consent decrees, like contracts, should be interpreted so that no provisions are superfluous).

The district court therefore correctly concluded that paragraph 110 "means what it says": all nonroad compression-ignition engines manufactured at Volvo Powertrain facilities for which certificates of conformity are sought must meet the requirements of the consent decree, including the nonroad pull-ahead. *Volvo Powertrain*, 854 F. Supp. 2d at 66. Volvo Powertrain contends that paragraph 110, if read in that fashion, would amount to "an elephant in the mousehole." Appellant's

Br. 32; *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). We disagree. For one thing, paragraph 110 is not a "vague" provision: it broadly applies on its face to "all" nonroad engines "manufactured at any" Volvo Powertrain facility. Nor do we think it "implausible" that the parties would have intended to apply the consent decree's applicable requirements to the Volvo Penta engines at issue. *Cf. Whitman*, 531 U.S. at 468 (applying the elephants-in-mouseholes principle where it is "implausible" that Congress would delegate vast powers through such "modest words"). Indeed, Volvo Powertrain's interpretation is the more implausible one. It would leave a sizable loophole in the consent decree, allowing Volvo to manufacture nonroad compression-ignition engines at the Skövde facility entirely without regard to the decree's requirements as long as some wholly owned Volvo subsidiary other than Volvo Powertrain or Volvo Construction could identify itself as the manufacturer. EPA presumably would have sought to avoid that result, and did so through paragraph 110.

## C.

Volvo Powertrain argues that the circumstances surrounding the negotiation of the decree and the parties' post-decree actions support the conclusion that the nonroad pull-ahead requirement is inapplicable to the 8,354 Volvo Penta engines. In interpreting a consent decree, however, "a court may not look to extrinsic evidence of the parties' subjective intent unless the document itself is ambiguous." *Segar*, 508 F.3d at 22; *see also Microsoft*, 147 F.3d at 945 n.7. Because we believe that the nonroad pull-ahead requirement unambiguously applies to the Volvo Penta engines, we have no occasion to consider the circumstances surrounding the decree's negotiation

or the parties' post-decree actions. Those considerations, in any event, would not alter our understanding of the decree's provisions.

Volvo Powertrain says that officials with EPA and the California Air Resources Board "knew that Penta manufactured nonroad engines at the time of the negotiations, but they nevertheless omitted Penta from the Decree." Appellant's Br. 35. In Volvo Powertrain's view, the fact that the United States asked Volvo Construction—but not Volvo Penta—to intervene in the enforcement action "speaks volumes about the meaning of the Decree." *Id.* at 36. We are unpersuaded. In 1998, Volvo Penta sought certificates of conformity for only 150 nonroad engines manufactured at the Skövde facility, fewer than 100 of which were imported into the United States. Volvo Construction, by contrast, sold more than 2,300 nonroad engines in the United States that year. Volvo Powertrain points to no evidence indicating that the federal negotiators involved with drafting the consent decree knew of the Volvo Penta engines. By contrast, Volvo officials presumably *did* know of the Volvo Penta engines, but evidently made no effort to exclude those engines from a provision whose terms encompass them. Indeed, Volvo Construction's motion to intervene, filed by Volvo Truck's attorneys, represented that Volvo Construction "is *the* Volvo Group company that sells these engines in the United States." Mot. to Intervene at 2 (emphasis added). Volvo Powertrain asserts that the misleading language in the motion was initially drafted by a lawyer for the United States. But if so, that would only further undercut any suggestion that the government officials who negotiated the consent decree knew that Volvo Penta manufactured nonroad engines for the U.S. market and intended to exclude Volvo Penta from the decree's scope.

As for the parties' post-decree actions, Volvo Powertrain

emphasizes that its sister company Volvo Penta "openly applied" for certificates of conformity under EPA's general regulations for model year 2005 vehicles rather than under the consent decree's nonroad pull-ahead requirement. Appellant's Br. 37. Volvo Powertrain supplies an affidavit from a Volvo Penta executive stating that Volvo Penta would have acted differently if it believed that the consent decree applied to its engines. And Volvo Powertrain notes that both EPA and the California Air Resources Board "certified the very Penta engine families for which they now seek penalties." *Id.* But even assuming Volvo executives believed they were complying with the consent decree, and even if certain EPA officials knew of Volvo Penta's conduct, the United States could still assert violations of the consent decree. *See United States v. Huebner*, 752 F.2d 1235, 1245 (7th Cir. 1985) (federal government not estopped from seeking enforcement of consent decree despite evidence that some federal officials were "cognizant" of defendants' conduct and failed to inform the defendants that they were violating the decree); *cf. Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63 (1984) ("general rule" is "that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law"). And as the EPA official responsible for managing the agency's engine certification program explains in an affidavit, EPA issues certificates of conformity after determining that the applicant has submitted the required information and that the emissions performance data included in the application is consistent with the regulatory standard for the engine type, size, and model year. A certificate of conformity does *not* reflect a conclusion that the engine satisfies other applicable requirements, such as those imposed by consent decrees and settlement agreements. Rather, EPA relies on applicants to include the information necessary to meet all applicable requirements and to assure the information's accuracy.

18

D.

Although Volvo Powertrain principally contends that none of the 8,354 Volvo Penta engines falls within the terms of the consent decree, it argues in the alternative that it should—at most—face liability only for engines actually imported into the United States and used in a non-stationary capacity. The consent decree defines nonroad compression-ignition engine to "mean[] a compression-ignition engine subject to the regulations in 40 C.F.R. Part 89." Consent Decree ¶ 3. The 8,354 engines in question undisputedly qualify as "compression-ignition engines." The only question is whether those engines qualify as "subject to the regulations in 40 C.F.R. Part 89" regardless of ultimate importation into the United States or ultimate use in a non-stationary capacity. We conclude they do.

While a certificate of conformity *permits* importing an engine into the United States, certain provisions of Part 89 apply only to engines *in fact* imported into the United States. *See, e.g.*, 40 C.F.R. § 89.1003(a)(1)(ii) ("importation into the United States of any new nonroad engine" is prohibited "unless such engine is covered by a certificate of conformity"). But other regulations in Part 89 apply to all engines for which a manufacturer seeks a certificate of conformity, regardless of whether the engines ultimately are sold into the United States. *See, e.g.*, *id.* § 89.115(d) (required content of application for certificate of conformity); *id.* § 89.117 (procedures for selecting test fleet for certificate of conformity application). Still other provisions of Part 89 apply to all engines for which a manufacturer *obtains* a certificate of conformity—again, without regard to whether the engines are imported into the United States. *See, e.g.*, *id.* § 89.123(a) (manufacturer must notify EPA of changes to certain information for engines covered by certificate of conformity); *id.* § 89.124(b) (emission test data must be retained for one year after certificate of conformity is

issued). The Volvo Penta engines thus would be "subject to the regulations in 40 C.F.R. Part 89" even if they remained outside the United States. Volvo Powertrain seeks to rely on the canon of statutory interpretation under which federal laws are presumed "'to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). But because a manufacturer brings itself within the jurisdiction of the United States when it affirmatively *asks* EPA to issue certificates of conformity, there is no issue of extraterritoriality here.

We are likewise unpersuaded by Volvo Powertrain's argument that an engine ultimately put to final use in a stationary capacity is not "subject to the regulations in 40 C.F.R. Part 89." Part 89 states that it "applies for all compression-ignition nonroad engines," 40 C.F.R. § 89.1(a), and the certificates of conformity sought by Volvo Penta allowed its engines to be used in the United States in non-stationary applications. It is true that the definition of "nonroad engine" excludes engines that "remain[] or will remain at a location for more than 12 consecutive months." *Id.* § 89.2. But as we have explained, certain Part 89 provisions apply to engines at the time of seeking a certificate of conformity, regardless of the engines' eventual use. *See, e.g.*, *id.* §§ 89.115(d), 89.117. Moreover, EPA's regulatory scheme enables manufacturers to identify their engines as either mobile or stationary. *See, e.g.*, U.S. Envt'l Prot. Agency, *Technical Highlights: Emission Regulations for Stationary and Mobile Engines* 2 (Sept. 2002). Indeed, even after Volvo Penta chose to identify its engines as nonroad engines for purposes of obtaining certificates of conformity, it had an additional opportunity to designate some of the engines as stationary when importing them into the United States, but did not do so. *See* EPA Form 3520-21, Engine Declaration Form (OMB No. 2060-0320) (allowing importers to check a box

in order to designate engines as stationary). Volvo Powertrain's understanding of the consent decree also would raise serious workability concerns, calling for constant and long-term monitoring of each engine to identify its use as stationary or non-stationary. But when asked by EPA in 2008 for information concerning the current whereabouts of the 8,354 Volvo Penta engines, Volvo Powertrain estimated that it and other Volvo entities would have that sort of information for less than 10% of their engines. For those reasons, the engines in question qualify as "nonroad engines" subject to the consent decree regardless of their eventual use in a stationary or non-stationary application.

## III.

Having concluded that the consent decree's nonroad pull-ahead requirement applies to the 8,354 Volvo Penta engines, we turn to the district court's choice of remedy. The parties agree that our review of the remedy is for abuse of discretion. *See, e.g.*, *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 532-33 (6th Cir. 2012); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). We note that, under our precedent, "it is unclear whether such deferential review is appropriate" when—as here—"the trial judge's decision was based on an interpretation of orders drafted by a different judge." *Nix*, 448 F.3d at 414. But we need not resolve that issue in light of the parties' agreement on the standard of review.

## A.

Volvo Powertrain argues that the monetary penalties allowed under the consent decree are confined to those set forth in the stipulated penalty provision. That provision states, with respect to the nonroad pull-ahead requirement, that if Volvo Truck (or its successor, Volvo Powertrain) "seeks certificates of conformity for any affected HDDEs [(Heavy-Duty Diesel

Engines)], but cannot certify compliance with . . . the Nonroad CI Engine standard pull-ahead requirements," then penalties "shall be calculated in accordance with the . . . procedures, equations, and values found in 40 CFR Part 86, Subpart L." Consent Decree ¶ 116(a). Volvo Powertrain contends that the stipulated penalty provision does not apply when an entity not specifically named in its terms, such as Volvo Penta, "seeks certificates of conformity."

As the district court observed, however, the "poorly drafted" stipulated penalty provision, if read literally, amounts to "nonsense." *Volvo Powertrain*, 854 F. Supp. 2d at 72. The provision's terms apply only to heavy-duty diesel engines. But heavy-duty diesel engines are *on-road* engines, *see* 40 C.F.R. § 86.082-2, and thus by definition could *never* be subject to the nonroad pull-ahead requirement. If the district court could only impose monetary penalties where the stipulated penalty provision squarely applied, the court would be barred from imposing any monetary penalties even if Volvo Powertrain itself sought a certificate of conformity for model year 2005 nonroad compression-ignition engines that it knew to be out of compliance with the nonroad pull-ahead requirement.

Where, as here, a consent decree "does not specify the consequences of a breach," the district court has "equitable discretion" to fashion a remedy for violations of the decree. *Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir. 1999); *accord Shy*, 701 F.3d at 532-33; *United States v. Virgin Islands*, 363 F.3d 276, 290-91 (3d Cir. 2004); *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995). Of course, "if parties to a consent decree wish to cabin the district court's equitable discretion by stipulating the remedies for breach, they are free to do so," and "the stipulation will fix the measure of relief to which the victim of a breach is entitled." *Cook*, 192 F.3d at 698. But we cannot read the ambiguous and

self-defeating provision for stipulated penalties here as embodying an intention to "cabin the district court's equitable discretion" in the circumstances of this case. Nothing in the decree expressly or impliedly precludes the district court from exercising its equitable discretion to fashion an alternative remedy. Rather, the consent decree fails to specify the consequences of the breach that occurred. *See id.* The district court therefore retained equitable discretion to craft a remedy for Volvo Powertrain's violations.

B.

When a district court exercises its equitable discretion to impose monetary penalties for violations of a consent decree, "the court must explain why it chose the calculation method it did and how the record supports its calculations." *FTC v. Trudeau*, 579 F.3d 754, 773 (7th Cir. 2009). The penalty figure must be "a reasonable approximation of losses, gains, or some other measure the court finds appropriate." *Id.*; *see also Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 455-57 (1932) (when court exercises equitable discretion to impose monetary penalty for violation of its own order, penalty *not* limited to "the pecuniary injury or damage which the act of disobedience caused the complaining party") (internal quotation marks omitted).

The district court adequately explained its calculation method here. As the court noted, paragraph 129 of the consent decree provides that, when reviewing any dispute under the decree, the court "should consider the effect of the resolution" on the other manufacturers who settled under comparable terms. Consent Decree ¶ 129. The consent decrees covering the other manufacturers contain similar stipulated penalty provisions. And one of the other manufacturers, Caterpillar, has already paid penalties for consent decree violations in line with the

stipulated penalty formula.  *See United States v. Caterpillar, Inc.*, 227 F. Supp. 2d 73, 86-89 (D.D.C. 2002).  The district court explained that, "[t]o allow Volvo Powertrain to pay a lesser penalty here might place it at a competitive advantage relative to the settling manufacturers who either complied with the emissions standards in their consent decrees or else paid the stipulated penalties." *Volvo Powertrain*, 854 F. Supp. 2d at 73. Accordingly, the court followed the formula specifying stipulated penalties for violations of the nonroad pull-ahead, resulting in a penalty of $65,759,212 before interest.

Volvo Powertrain seeks to distinguish the Caterpillar case on the ground that Caterpillar made a "conscious decision" to certify engines in violation of the consent decree, while Volvo Powertrain had no opportunity to make an "informed, *ex ante* choice" between complying with the decree and paying a penalty.  Appellant's Br. 58-59.  Volvo Powertrain did, however, have an opportunity to seek clarification from the district court of its obligations concerning the Penta engines.  As a general rule, "a party may ask the district court to issue an order clarifying . . . a [consent] decree." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007) (emphasis omitted); *see, e.g.*, *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013); *Microsoft*, 147 F.3d at 942; *see also United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168-69 (D.D.C. 2011) (collecting cases in which parties filed successful motions for clarification "ask[ing] the Court to construe the scope of its Order by applying it in a concrete context or particular factual situation").  And the decree in this case specifically states that the district court "retains jurisdiction . . . for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction . . . of this Consent Decree." Consent Decree ¶ 151.  That option was available to Volvo Powertrain, for instance, when the California Air Resources

Board official asked in late 2004 whether the Volvo Penta engines were subject to the consent decree.

Volvo Powertrain also argues that EPA has presented no "specific evidence" that Volvo entities obtained a competitive advantage by certifying the noncompliant Penta engines. Appellant's Br. 59. We acknowledge that the district court *could* have chosen to deviate downward from the consent decree's formula for stipulated penalties based on that consideration. But the "abuse of discretion" standard "means 'that the [district] court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *United States v. Dockery*, 955 F.2d 50, 54 (D.C. Cir. 1992) (emphasis omitted) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)). We believe the district court's decision to follow the stipulated penalty formula lies comfortably within that range of choice.

Volvo Powertrain further contends that the district court should have considered the statutory factors enumerated in section 205(c) of the Clean Air Act for civil penalties in EPA administrative actions. *See* Clean Air Act § 205(c), 42 U.S.C. § 7524(c) (EPA Administrator may assess civil penalty for violations of Clean Air Act certificate-of-conformity requirements, taking into account "gravity of the violation," "economic benefit or savings," "size of the violator's business," "violator's history of compliance," "action taken to remedy the violation," "effect of the penalty on the violator's ability to continue in business," and "such other matters as justice may require"); *accord* 40 C.F.R. § 89.1006(c)(2) (restating same seven statutory factors). But Volvo Powertrain is charged with violations of the consent decree, not with violations of the Clean Air Act. *See Microsoft*, 147 F.3d at 944 ("As the settlement of a litigation, the decree may require less than the statute under

which the suit was brought, or more, so the violation of one is not necessarily a violation of the other.") (citations omitted). And while the consent decree provides that Volvo Truck (and its successor Volvo Powertrain) "shall be subject to and comply with all requirements of 40 C.F.R. Part 89 and of the Act," Consent Decree ¶ 61, it does not say that the *district court* shall be bound by the factors set forth in the Clean Air Act and Part 89 with respect to the assessment of penalties.

None of this is intended to suggest that the district court could not consider the statutory factors in section 205 when crafting an equitable remedy. Those factors reflect traditional equitable principles, which of course guide the district court in its exercise of equitable discretion. *See Leman*, 284 U.S. at 456-57; *Connolly v. J.T. Ventures*, 851 F.2d 930, 932-34 (7th Cir. 1988). But the district court was not required expressly to address each of those factors one by one. And we cannot say that the district court's ultimate decision to impose a monetary penalty of $65,759,212 plus interest was inequitable.

## C.

Finally, Volvo Powertrain contests the district court's calculation of its liability for interest. Volvo Powertrain argues that it should not be held liable for interest that accrued before the date of the United States' written demand. The United States acknowledges that interest ordinarily should not accrue before the written demand, but contends that the assessment of pre-demand interest should be upheld because another settling manufacturer paid pre-demand interest on stipulated penalties for violation of a parallel consent decree.

We need not resolve the merits of the issue because Volvo Powertrain failed to preserve its challenge to the assessment of pre-demand interest. Under the dispute resolution provisions of

the consent decree, the parties must first seek to resolve any dispute through informal negotiations, *see* Consent Decree ¶ 132; if those negotiations fail, "the position advanced by the United States shall be considered binding, unless, within 30 days after the conclusion of the informal negotiation period," Volvo Truck (or its successor Volvo Powertrain) "invokes the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute." *Id.* ¶ 133. The parties agreed that the prescribed procedure would be the "exclusive mechanism" to resolve disputes related to the decree. *Id.* ¶ 129. And while Volvo Powertrain invoked the formal dispute resolution procedures by serving a written statement of position on the United States, that statement contained no challenge to the inclusion of interest accruing before the United States' written demand.

Volvo Powertrain argues that it preserved its challenge to the award of pre-demand interest by raising the matter in district court. Ordinarily, that would suffice to preserve an issue for appellate review. Here, however, the parties assented to a different dispute resolution procedure, and agreed that the United States's position would prevail on any matter unless Volvo Powertrain contests the matter promptly. Volvo Powertrain does not dispute that its statement of position omitted any mention of pre-demand interest, and it identifies no other document that might qualify as "a written Statement of Position on the matter" within the 30 days allotted. Volvo Powertrain thus forfeited its challenge to the award of pre-demand interest.

\* \* \* \* \*

The judgment of the district court is affirmed.

*So ordered.*